UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————x
                                          :
WELLNX LIFE SCIENCES INC.,                :
f/k/a NXCARE INC.,                        :
                                          :
                    Plaintiff,            :          06 Civ. 7785 (PKC)
                                          :
          -against-                       :
                                          :
IOVATE HEALTH SCIENCES RESEARCH INC., :
IOVATE HEALTH SCIENCES GROUP INC.,        :          MEMORANDUM
IOVATE HEALTH SCIENCES INC., IOVATE       :          AND ORDER
HEALTH SCIENCES U.S.A. INC., CANUSA       :
PRODUCTS INC., MUSCLEMAG                   :
INTERNATIONAL CORPORATION (U.S.A.)        :
INC., PAUL GARDINER, TERRENCE BEGLEY, :
ROBERT KENNEDY, JOHN CRAIG and            :
VINCENT SCALISI,                          :
                                          :
                    Defendants.           :
                                          :
————————————————————————x

P. KEVIN CASTEL, U.S.D.J.

        Plaintiff Wellnx Life Sciences Inc. ("Wellnx") brings this action against several

defendants alleging violations of the Lanham Act, conspiracy to violate the Sherman Act, and

various tort and statutory claims under New York State law.  Wellnx manufactures and sells dietary

supplements and is a direct competitor of Iovate Health Sciences Group Inc. and/or its subsidiaries

Iovate Health Sciences Research Inc., Iovate Health Sciences Inc., and Iovate Health Sciences

U.S.A. Inc. (collectively "Iovate").  Canusa Products Inc. and Musclemag International Corporation

(U.S.A.) Inc. (collectively "Canusa") are affiliated corporations that publish bodybuilding

periodicals in which dietary supplements are advertised.  The individual defendants are agents or

employees of the above-named corporate defendants.

This action was commenced on September 28, 2006.  Plaintiff filed an amended complaint on November 17, 2006.  Defendants have moved to dismiss the Lanham Act and Sherman Act claims – Claims 1 and 2 in the amended complaint – for failure to state a claim.  Rule 12(b)(6), Fed. R. Civ. P.  Defendants move to dismiss the state claims on the grounds that upon dismissal of the federal claims, the Court should decline to exercise supplemental jurisdiction.

For the reasons stated herein, defendants' motions are granted.

I.      BACKGROUND

The following facts from the amended complaint are taken as true for the purposes of this motion.  See Iqbal v. Hasty, 490 F.3d 143, 147 (2d Cir. 2007).  All reasonable inferences are drawn in favor of the plaintiff, the non-movant.  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

Preliminarily, I note that in opposition to the motions to dismiss, plaintiff submitted declarations by fact witnesses with exhibits.  These materials are referred to in plaintiff's brief.  Defendants seek to have the declarations and exhibits excluded from consideration of the motions.  Iovate has submitted a declaration by a fact witness in an effort to show that plaintiff's extrinsic materials relate to a non-party and are irrelevant.  Canusa has not submitted declarations by fact witnesses or exhibits, although Canusa does make factual allegations in its brief that go beyond the amended complaint.

"'[W]hen matters outside the pleadings are presented in response to a 12(b)(6) motion,' a district court must either 'exclude the additional material and decide the motion on the complaint alone' or 'convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material.'"  Friedl v. City of N.Y., 210 F.3d

79, 83 (2d Cir. 2000) (quoting <u>Fonte v. Bd. of Managers of Cont'l Towers Condo.</u>, 848 F.2d 24, 25

(2d Cir. 1988)) (alteration in <u>Friedl</u>).  Conversion is not required unless the court's decision is

affected by matters outside the pleadings.  <u>Amaker v. Weiner</u>, 179 F.3d 48, 51 (2d Cir. 1999) (noting

that "reversal [of the district court] for lack of conversion is not required unless there is reason to

believe that the extrinsic evidence actually affected the district court's decision and thus was not at

least implicitly excluded").  Thus the court "errs when it considers affidavits and exhibits . . . , or

relies on factual allegations contained in legal briefs or memoranda . . . in ruling on a 12(b)(6)

motion to dismiss."  <u>Friedl</u>, 210 F.3d at 84-85 (internal citations and quotation marks omitted).

Defendants' Rule 12(b)(6) motions will not be converted into motions for summary

judgment.  The materials outside the amended complaint – including declarations, exhibits and

factual allegations made in the briefs – are excluded from consideration by the Court.  The universe

of facts for the purposes of this motion is limited to those alleged in the amended complaint and all

reasonable inferences to be drawn from those facts.

A.      <u>Relevant Product Markets in which Wellnx, Iovate and Canusa Operate</u>

Plaintiff Wellnx and defendant Iovate manufacture, distribute, market and advertise

dietary supplements, including sports nutrition/bodybuilding supplements ("bodybuilding

supplements").  (Am. Compl. ¶¶ 18-19.)  In the dietary supplement market, Wellnx and Iovate are

direct competitors.  (<u>Id.</u> ¶ 22.)  While there is no indication of how many firms compete in this

market, the amended complaint repeatedly states that the dietary supplement industry is "highly

competitive."  (<u>Id.</u> ¶¶ 21, 34, 107.)

The dietary supplement market is characterized, according to plaintiff, by three

distinct submarkets: the markets for (1) bodybuilding supplements, (2) weight loss supplements, and

(3) vitamins.  (<u>Id.</u> ¶ 20.)  The products in each submarket are not reasonably interchangeable with

those in the other submarkets, but there is a high cross-elasticity of demand within each submarket. (Id. ¶ 102.) Wellnx and Iovate not only compete generally in the dietary supplement market, but also in the bodybuilding supplement submarket.  (Id. ¶ 22.)  Bodybuilding supplements are sold to end consumers directly by manufacturers and by retailers.  (Id. ¶ 90.)   Retailers purchase products from both manufacturers and distributors, the latter of which also purchase inventory from manufacturers.  (Id. ¶¶ 54, 90.)

Canusa is a "leading publisher" of bodybuilding publications in the United States. (Id. ¶ 10.)  Canusa is alleged to have approximately a 40% share of the consumer market for such publications.  (Id. ¶ 124.)  Bodybuilding publications in general feature editorial content and advertisements for various products.  (Id. ¶ 23.)  Canusa directly solicits advertising business from manufacturers and distributors of bodybuilding supplements.  (Id. ¶ 38.)

There is considerable demand among bodybuilding supplement manufacturers and distributors for this advertising space.  According to plaintiff, advertising in bodybuilding publications is the dominant method by which bodybuilding supplements are marketed to consumers.  (Id. ¶ 45.)  The amended complaint explains that consumers of bodybuilding supplements represent a niche market and that other advertising methods – such as advertising in general audience publications, on the radio, television or the internet – are not substitutes for or interchangeable with advertising in bodybuilding magazines.  (Id. ¶¶ 45, 89. 108.)  Consumer demand for bodybuilding supplements is alleged to be "substantially if not wholly generated through print advertisements" in these publications.  (Id. ¶ 106.)  This creates a specific market for advertising space in bodybuilding publications among manufacturers and distributors of bodybuilding supplements.  (Id. ¶¶ 109, 112.)

Plaintiff's claims in this case concern both (1) the bodybuilding supplement submarket and (2) the market for advertising space in bodybuilding publications. The geographic scope of both markets is alleged to be the United States; each state and the District of Columbia is alleged to be a distinct submarket. (Id. ¶ 114-16.)

Wellnx, Iovate and Canusa play different roles in the distribution chains in each market. In the bodybuilding supplement market, Wellnx and Iovate are manufacturers who sell to distributors, retailers and end consumers. Canusa is not in the distribution chain for these products, but consumers of Canusa's bodybuilding publications overlap with consumers of bodybuilding supplements. (Id. ¶ 105.) In the market for advertising space in bodybuilding publications, Wellnx and Iovate, as advertisers of their products, are consumers. Canusa is a seller of advertising space and markets this space directly to advertisers.

B.      The Agreement Between Iovate and Canusa

The amended complaint alleges that beginning in the year 2000 at the latest, Iovate and Canusa have maintained an exclusive agreement for advertising considerations (the "Agreement"). Under the Agreement, in addition to regular payments by Iovate to Canusa for advertising space, Iovate pays Canusa 10% of Iovate's gross receipts from direct purchases of Iovate products. (Am. Compl. ¶ 31.) Iovate receives:

> (a) preferential anti-competitive advertising treatment in Canusa's bodybuilding periodicals; (b) review of competitors' advertisements before such advertisements are published in Canusa periodicals; (c) the right by Iovate to reject its competitors' advertisements or have the opportunity to disparage its competitors' new products or beat them to the market with the same or similarly formulated products; and (d) the right to publish in Canusa periodicals editorial content written by Iovate, but which falsely appeared to be written by the editors of such periodicals.

(Id.)  The Agreement's termination provisions require that Iovate pay Canusa $2 million if the Agreement is discontinued.  (Id.)

Plaintiff alleges that the existence of the Agreement was intentionally withheld from Iovate's competitors, including plaintiff, when Canusa solicited sales of advertising space in its bodybuilding publications.  (Id. ¶ 38-40.)  By failing to disclose the Agreement when Canusa presented its advertising rates, publication schedules and specifications for advertisements, Canusa allegedly misled its advertising customers into believing that its advertising space was sold on a "fair and equal basis."  (Id. ¶ 41.)  Plaintiff also alleges that the Agreement was undisclosed to consumers of Canusa's periodicals, which misrepresented Canusa's neutrality towards the products in the bodybuilding supplement market.  (Id. ¶ 75.)

The amended complaint states that, as contemplated by the Agreement, Iovate has reviewed competitors' proposed advertisements and exercised veto power over some of those advertisements.  This conduct allegedly injured Wellnx and at least 19 other companies that purchased advertising space from Canusa.  (Id. ¶ 43.)

C.    Iovate's Interference with Wellnx in the Market for Advertising Space

Wellnx alleges that its ability to purchase advertising space has been impeded by other conduct by Iovate, separate from its Agreement with Canusa.  In or about June 2006, Iovate allegedly began contacting publishers of bodybuilding periodicals other than Canusa and caused them to cancel or reject Wellnx's advertisements.  (Am. Compl. ¶¶ 44-53.)  The publishers contacted were Chelo Publishing, Inc. ("Chelo"), Iron Man Magazine ("Iron Man"), Advanced Research Press, Inc. ("Advanced"), and Weider.  The amended complaint speculates that the publishers "likely received financial enticements for their cooperation" or were threatened with discontinued

advertising business from Iovate.  (Id. ¶ 98.)  The amended complaint states that the publishers each knew that Iovate had contacted or planned to contact other publishers to secure similar agreements.

The result of the conduct by Iovate and the named publishers has been to foreclose Wellnx's access to 70% of the market for advertising space in bodybuilding publications.  Canusa, which possesses "dominant market power" in the market for advertising space, controls 40% of the market, and 30% is controlled by the other named publishers combined.  (Id. ¶ 124-25.)   While this leaves 30% of the market available to Wellnx, plaintiff alleges, without explanation, that "advertising space in bodybuilding publications that accept Wellnx's advertisements is not a substitute for and is not interchangeable with advertising space in the market foreclosed . . . ."  (Id. ¶ 110.)

Plaintiff states that the refusal by these publishers to accept its business constitutes a conspiracy between and among Iovate and the publishers.  (Id. ¶ 94.)  To support the allegation of an of agreement between the publishers, Wellnx cites their parallel conduct together with purported "plus factors."  (Id. ¶ 95.)  Specifically, Wellnx states that (1) the refusal of its advertisements was a departure from prior practice (id. ¶ 96); (2) each publisher was aware that Iovate solicited similar agreements from other publishers (id. ¶ 97); (3) each publisher had a "substantial profit motive" for refusing Wellnx's advertising because Iovate had offered financial incentives or threatened to withdraw its own advertising business (id. ¶ 98); (4) the refusal to deal was uniformly the same by each publisher (id. ¶ 99); and (5) refusing Wellnx's business was against each publisher's self-interest because it caused them to reject valid offers for advertising space (id. ¶ 100).  The amended complaint also speculates that "the publishers of bodybuilding publications that formed vertical agreements with Iovate, including Canusa, were likely made aware of the existence of the group

boycott agreements with other [bodybuilding] publications and formed agreements with Iovate believing their horizontal competitors would follow suit." (Id. ¶ 101.)

This conduct allegedly has injured Wellnx as well as overall competition in the market for advertising space in bodybuilding publications. (Id. ¶ 117.)  Because advertising space is integral to creating consumer demand for bodybuilding supplements, plaintiff also alleges that competition in the market for bodybuilding supplements has been harmed by the conspiracy. Plaintiff alleges that in the bodybuilding supplement market, the alleged boycott has created a significant barrier to entry and that prices have been maintained at supracompetitive levels. (Id. ¶¶ 117-119.)

D.     Iovate's Interference with Wellnx's Distribution Agreements

In addition to interfering with Wellnx's ability to advertise its products, Wellnx claims that Iovate also interfered with its relationships with distributors of bodybuilding supplements. (Am. Compl. ¶¶ 54-71.)  Beginning in or about January 2005, Iovate contacted the distributors Sportika Exports, Inc. ("Sportika"), Bob O'Leary Sports Science ("BOSS"), DNA Sports Nutrition Distributors ("DNA"), Dynamic Marketing, Inc. ("Dynamic"), Select Nutrition ("Select") and Tropicana Health and Fitness ("Tropicana"), and pressured them to terminate existing distribution agreements with Wellnx. (Id.)  All of these firms are U.S. companies except for Tropicana, which is a British distributor.  Iovate threatened to withdraw its business from the distributors, and advised them that Iovate "disagreed with Wellnx's marketing practices." (Id.) Wellnx alleges that Iovate contacted other unnamed distributors "in efforts to compel them not to carry or support Wellnx's products." (Id. ¶ 70.)  With respect to the named distributors, Iovate succeeded in canceling Wellnx's distribution agreements. (Id. ¶¶ 58, 59, 61, 63, 65, 69.)

E.      Plaintiff's Federal Claims

Plaintiff alleges that the foregoing conduct constitutes unfair competition in violation of section 43(a) of the Lanham Act, and a conspiracy to restrain trade in violation of section 1of the Sherman Act.

Plaintiff's claim under the Lanham Act principally rests on a "false advertising" theory.  The false advertising claim is somewhat unusual in the sense that it does not involve a traditional advertising or promotional campaign in which allegedly false or misleading statements were made.  Rather, plaintiff alleges that the following acts amounted to false advertising under the Lanham Act:

> (1) That Iovate and Canusa published editorials in Canusa's publications that were authored by Iovate, but falsely attributed to Canusa's editors;
>
> (2) that Iovate and Canusa failed to disclose the existence of the Agreement to consumers of (a) bodybuilding supplements, (b) Canusa publications, and (c) advertising space in Canusa's publications; and,
>
> (3) that Iovate made misrepresentations to (a) distributors of bodybuilding supplements and (b) publishers of bodybuilding periodicals, including but not limited to Canusa, in the course of pressuring those distributors and publishers to refuse Wellnx's business.

The basic premise of plaintiff's Lanham Act claim is that this conduct had the result of either disparaging Wellnx's products or aggrandizing Iovate's products.  This conduct is also alleged to have created the misimpression among consumers of bodybuilding supplements, consumers of bodybuilding publications and consumers of advertising space in bodybuilding publications that

Canusa was neutral and without preferences with regard to the various manufacturers and distributors of bodybuilding supplements.

Plaintiff's Sherman Act claim alleges that Iovate orchestrated a "hub and spokes" conspiracy to boycott Wellnx in the market for advertising space in bodybuilding publications, and that this unreasonably restrained trade in violation of section 1.  This boycott is alleged to have consisted of not only separate agreements between Iovate and the individual publishers, but also agreements among the various publishers to collectively refuse Wellnx's advertising business.[1]

This boycott allegedly harmed Wellnx and also competition in the market for advertising space.  Competition in the market for bodybuilding supplements was also allegedly harmed.  Plaintiff seeks compensatory damages, treble damages, attorneys' fees and injunctive relief.

II.     DISCUSSION

A.     Legal Standard

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which is rests' . . . ." Bell Atl. Corp. v. Twombly, __ U.S. __, 127 S. Ct. 1955, 1964 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)) (alteration in Twombly).  When a defendant tests the sufficiency of a complaint by Rule 12(b)(6) motion, "[t]o survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"  ATSI Commc'ns, 493 F.3d at 98 (quoting Twombly, 127 S. Ct. at 1965).  The complaint is measured against a flexible "plausibility standard," which obligates the "pleader to amplify a claim with some factual allegations

---

[1] I note that plaintiff's section 1 claim, as alleged in the amended complaint, does not concern Iovate's conduct with respect to distributors of bodybuilding supplements.  (See Am. Compl. ¶¶ 88, 94, 101, 116, 126.)

in those contexts where such amplification is needed to render the claim <u>plausible</u>." <u>Iqbal</u>, 490 F.3d at 157-58. This "does not require heightened fact pleading of specifics," <u>In re Elevator Antitrust Litig.</u>, __ F.3d __, No. 06-3128-CV, 2007 WL 2471805, at *2 (2d Cir. Sept. 4, 2007); <u>see</u> <u>Erickson v. Pardus</u>, __ U.S. __, 127 S. Ct. 2197, 2200 (2007); however, it does "require enough facts to 'nudge [plaintiff's] claims across the line from conceivable to plausible.'" <u>Elevator Antitrust Litig.</u>, 2007 WL 2471805, at *2 (quoting <u>Twombly</u>, 127 S. Ct. at 1974) (alteration in <u>Elevator Antitrust Litig.</u>).[2]

B.    <u>The Lanham Act Claim</u>

Claim 1 in the amended complaint alleges that defendants engaged in unfair competition in violation of section 43(a) of the Lanham Act. The portion of the Lanham Act invoked by plaintiff reads, in relevant part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –
>
> > (A) . . .
> >
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). While the traditional core of liability created under subsection (a)(1)(B) is false advertising, the provision is broadly worded and covers more than traditional commercial

---

[2] Contrary to defendants' contention, Rule 8(a), Fed. R. Civ. P., and not Rule 9(b), Fed. R. Civ. P., applies to false advertising claims under the Lanham Act. <u>See</u> <u>Chapdelaine Corp. Sec. & Co. v. Depository Trust & Clearing Corp.</u>, No. 05 Civ. 10711(SAS), 2006 WL 2020950, at *3 (S.D.N.Y. July 13, 2006) (citing <u>Nasdaq Stock Mkt., Inc. v. Archipelago Holdings, LLC</u>, 336 F. Supp. 2d 294, 305 (S.D.N.Y. 2004)); <u>see also</u> <u>Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit</u>, 507 U.S. 163, 168 (1993) (noting that heightened pleading standards "must be obtained by the process of amending the Federal Rules, and not by judicial interpretation").

advertising and promotional activities.  However, courts must be mindful that "[section] 43(a) can never be a federal codification of the overall law of unfair competition, . . . but can apply only to certain unfair trade practices prohibited by its text."  Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 29 (2003) (internal citation and quotation marks omitted); see also Alfred Dunhill, Ltd. v. Interstate Cigar Co., 499 F.2d 232, 237 (2d Cir. 1974) (noting section 43(a) "does not have boundless application as a remedy for unfair trade practices").

Subsection (a)(1)(B) "makes actionable 'false or misleading descriptions or false or misleading representations of fact made about one's own or another's goods or services.'"  Boule v. Hutton, 328 F.3d 84, 90 (2d Cir. 2003) (quoting S.C. Johnson & Son, Inc. v. Clorox Co., 241 F.3d 232, 238 (2d Cir. 2001)).  The plaintiff must show either (1) that the challenged advertisement or promotion is "literally false, i.e., false on its face," or (2) "that the advertisement, while not literally false, is nevertheless likely to mislead or confuse consumers."  Time Warner Cable, Inc. v. DIRECTV, Inc., __ F.3d __, No. 07-0468-CV, 2007 WL 2263932, at *5-6 (2d Cir. Aug. 9, 2007). The Second Circuit recently adopted the "false by necessary implication" doctrine for assessing misrepresentations.  See id. at *10.  "Under this doctrine, a district court evaluating whether an advertisement is literally false must analyze the message conveyed in full context[;] . . . it must consider the advertisement in its entirety and not . . . engage in disputatious dissection."  Id. (internal quotation marks and citations omitted) (third alteration in original).  "If the words or images, considered in context, necessarily imply a false message, the advertisement is literally false . . . ." Id.

The false, misleading or confusing representation must have "misrepresented an inherent quality or characteristic" of the goods, services or commercial activities at issue.  Nat'l Basketball Ass'n v. Motorola, Inc., 105 F.3d 841, 855 (2d Cir. 1997) (internal quotation marks

omitted).  The Lanham Act does not impose liability on statements of opinion; therefore, a

representation that "could not reasonably be seen as stating or implying provable facts" will not

support liability under section 43(a).  Groden v. Random House, Inc., 61 F.3d 1045, 1051 (2d Cir.

1995).

       The allegations in the amended complaint, taken as true and drawing all reasonable

inferences in plaintiff's favor, fail to state a claim that defendants made any false, misleading or

confusing statements or representations of fact relating to any of the parties' goods, services or

commercial activities.  Since plaintiff's Lanham Act claim falters on this basis, there is no need to

consider whether the amended complaint adequately pleads that any such statements were made in

the course of "commercial advertising or promotion," or issues raised by defendants regarding

plaintiff's standing.

       1.      Editorial Content in Canusa Publications Authored by Iovate

       Plaintiff alleges that the provision of the Agreement between Iovate and Canusa

which allows Iovate to write editorial content in Canusa publications constitutes false advertising.

However, despite the allegation that this agreement exists, the amended complaint does not aver that

any articles have actually been written by Iovate pursuant to the Agreement.  Consequently, plaintiff

does not identify any statements made in the editorials that are false or misleading.[3]

       The complete absence of allegations that Canusa has published articles ghost-written

by Iovate which contain false or misleading statements renders the amended complaint insufficient

to state a claim under the Lanham Act.  The amended complaint fails to provide defendants with

---

[3] I note that in opposition to the motion to dismiss, plaintiff submitted declarations attaching articles from Canusa publications that were allegedly written by employees of a corporation called "MuscleTech."  MuscleTech is not a party to this action and it is not referred to in any of the 175 enumerated paragraphs in the amended complaint. Irrespective of MuscleTech's status in this case, a Rule 12(b)(6) motion (with exceptions not relevant here) looks only to the complaint.  This motion has not been converted into one for summary judgment and these extrinsic materials are not considered.

sufficient notice of plaintiff's claim and the grounds upon which it rests.  While it is certainly <u>conceivable</u> that Iovate would use its power under the Agreement to publish content constituting false advertising under the Lanham Act, the amended complaint fails to present "enough facts to 'nudge [plaintiff's] claims across the line from conceivable to plausible.'" <u>Elevator Antitrust Litig.</u>, 2007 WL 2471805, at *2 (quoting <u>Twombly</u>, 127 S. Ct. at 1974) (alteration in <u>Elevator Antitrust Litig.</u>).

In addition, the Supreme Court has held that the mere act of publishing a written work without proper attribution to its creative source is not actionable under the Lanham Act.  <u>See</u> <u>Dastar Corp. v. Twentieth Century Fox Film Corp.</u>, 539 U.S. 23 (2003).  To the extent that the amended complaint can be construed to raise such a claim, I note that such conduct is not properly viewed as false advertising.  It is more akin to "reverse passing off," which occurs when "'A' sells 'B's' product under 'A's' name."  <u>Waldman Publ'g Corp. v. Landoll, Inc.</u>, 43 F.3d 775, 780 (2d Cir. 1994); <u>see also</u> <u>Dastar</u>, 539 U.S. at 27 n.1.  Reverse passing off is prohibited by the Lanham Act under 15 U.S.C. § 1125(a)(1)(A), and not the false advertising provision, 15 U.S.C. § 1125(a)(1)(B), quoted above.  Subsection (a)(1)(A) creates liability for, <u>inter alia</u>, the use of "any false designation of origin" in a manner which "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . ."  15 U.S.C. § 1125(a)(1)(A).  The Second Circuit had applied this prohibition to "the reproduction of a [written] work with a false representation as to its creator."  <u>Waldman Publ'g</u>, 43 F.3d at 781.

In <u>Dastar</u>, the defendant made use of an uncopyrighted work without attribution to its original creator.  The plaintiffs alleged that this conduct was a false designation of origin likely to deceive consumers as to the origin of the repackaged goods.  The Court "read[] the phrase 'origin of

goods' in the Lanham Act in accordance with the Act's common-law foundations (which were <u>not</u> designed to protect originality or creativity), and in light of the copyright and patent laws (which <u>were</u>)," and held that "the phrase refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." 539 U.S. at 37. Therefore, the failure to properly name contributors to a written work does not provide a basis for liability under the Lanham Act.

The significance of <u>Dastar</u> for the purposes of this case is that a Lanham Act claim cannot be based on false designation of authorship in Canusa's publications. <u>See generally</u> <u>Thomas Publ'g Co., LLC v. Tech. Evaluation Ctrs., Inc.</u>, No. 06 Civ. 14212(RMB), 2007 WL 2193964 (S.D.N.Y. July 27, 2007) (discussing <u>Dastar</u>). Since the amended complaint does not allege that any other false, misleading or confusing statements or representations were made in connection with the articles, the allegations relating to editorial content in Canusa publications fail to state a claim under the Lanham Act.

2.      <u>Failure to Disclose the Agreement between Iovate and Canusa</u>

Plaintiff also alleges that Canusa and Iovate engaged in false advertising under the Lanham Act by failing to disclose the existence of their Agreement to (1) consumers of Canusa's publications, (2) consumers of bodybuilding supplements, and/or (3) consumers of advertising space in bodybuilding publications.

With respect to the nondisclosure of the Agreement to consumers of Canusa publications and consumers of bodybuilding supplements, the amended complaint fails to allege that any representations or statements were made to either of these groups. The plain text of section 43(a) reveals that the starting point for establishing a claim is the "use[ of] . . . any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading

description of fact, or false or misleading representation of fact . . . ."  15 U.S.C. § 1125(a)(1).  An omission, unaccompanied by any of the above, does not violate the Lanham Act.  As one district court accurately observed, "'a failure to disclose facts is not actionable under [section] 43(a),' unless the failure is relevant to an affirmative statement that is made false or misleading by its omission." Register.Com, Inc. v. Domain Registry of Am., Inc., No. 02 Civ. 6915(NRB), 2002 WL 31894625, *14 (S.D.N.Y. Dec. 27, 2002) (quoting J. Thomas McCarthy, 5 McCarthy on Trademarks, vol. 5, at § 27:13 (2002)).

   The failure of the amended complaint to allege that any statements or representations were ever made by the defendants to consumers of bodybuilding publications or bodybuilding supplements renders the amended complaint inadequate to state a claim for false advertising under the Lanham Act.  The nondisclosure of an agreement that gives Iovate, inter alia, access to competitors' advertisements, a degree of control over Canusa's acceptance of competitors' advertisements or the "right" to disparage competitors' products, is not alone sufficient.

   With respect to statements made to consumers of advertising space in bodybuilding publications, the amended complaint alleges that "Canusa represented to potential and actual advertisers its rates, publication schedules and specifications for advertisements to be run in the Canusa publications."  (Am. Compl. ¶ 39.)  Plaintiff alleges that in so-representing its policies to advertising customers, "the deliberate concealment of the Illicit Agreement intentionally misled [advertising customers] . . . to believe advertising in [Canusa] Publications was being offered . . . on a fair and equal basis.  (Id. ¶ 41.)

   Plaintiff does not contend that Canusa's representations were literally false.  Thus, to defeat the motion to dismiss, the facts alleged, taken as true, must plausibly support the allegation that the truthful representation of rates, schedules and specifications either implied, or would be

likely to mislead or confuse consumers into believing, that advertising space was offered on a "fair and equal basis."

Claims that commercial advertisements or promotions are false, confusing or misleading will often be unfit for dismissal on a Rule 12(b)(6) motion.  See Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics, 859 F. Supp. 1521, 1531-32 (S.D.N.Y. 1994).  In this case, however, the amended complaint fails to plead facts sufficient to support the inference that Canusa implied any facts whatsoever regarding its method for choosing between competing offers, or the process for approving advertisements proposed by different customers.  The mere act of truthfully communicating rates, schedules and specifications does not reasonably suggest any facts regarding the existence, vel non, of special access agreements with other advertisers or preferences between advertising consumers.

Therefore, the amended complaint fails to state a claim for false advertising in connection with Canusa's representations of its rates, publication schedules and specifications to potential and actual consumers of advertising space.

3.     Iovate's Representations to Distributors and Other Publishers

The last category of misrepresentations alleged in the amended complaint refers to representations made by Iovate to (1) publishers of bodybuilding periodicals and (2) distributors of bodybuilding supplements, which resulted in the termination of Wellnx's advertising and distribution agreements.

With respect to media publishers, plaintiff alleges that Iovate either threatened to withdraw its advertising business from those publications or paid those publishers to terminate its

advertising arrangements with Wellnx.  Neither is alleged to be a false statement or misrepresentation of any fact, and neither is actionable under the Lanham Act.

With respect to the representations made to distributors of bodybuilding supplements, plaintiff alleges that Iovate either advised distributors that it "disagreed" with Wellnx's marketing practices or threatened to withdraw its business from the distributors if they continued to deal with Wellnx.  The general statement of disagreement with Wellnx's marketing practices is, at most, a statement of Iovate's opinion, which is not actionable under the Lanham Act.  See Groden, 61 F.3d at 1051.  The threat to withdraw its own business is not alleged to be false or misleading, and so it, too, is not actionable under the Lanham Act claim.[4]

Section 43(a) is not a "federal codification of the overall law of unfair competition, but can apply only to certain unfair trade practices prohibited by its text."  Dastar, 539 U.S. at 29 (internal citation and quotation marks omitted).  The facts alleged in the amended complaint suggest that Iovate has singled out one of its many competitors, Wellnx, for unfavorable treatment.  Iovate is also alleged to have entered into an exclusive agreement with Canusa which provides Iovate with access to competitors' advertisements and gives Iovate the power to approve or disapprove proposed advertisements, among other privileges.  But section 43(a) "does not have boundless application as a remedy for unfair trade practices."  Alfred Dunhill, 499 F.2d at 237.  As plaintiff has failed to allege

---

[4] I note that in opposing the motions to dismiss, plaintiff argues that the diminished presence of Wellnx products in the bodybuilding supplement market is due to defendants' conduct and has created the "misrepresentation" to consumers of bodybuilding supplements that Wellnx is unable to successfully compete in the market with Iovate and its other competitors.  This claim, perhaps more than those more explicitly alleged in the amended complaint, demonstrates plaintiff's fundamental misunderstanding of the scope and province of the Lanham Act.  By seeking to impose liability on defendants, not for making any false statements or misrepresentations, but for a general misimpression of plaintiff that may exist in the marketplace, plaintiff advances a theory of liability that is completely untethered from the text of the Lanham Act or the case law applying its provisions.  This claim, like those raised more explicitly in the amended complaint and discussed above, fails to state a claim upon which relief can be granted.

conduct that violates section 43(a), the amended complaint fails to state a claim on which relief can be granted under the Lanham Act.

      C.      <u>Conspiracy to Violate Section 1 of the Sherman Act</u>

        Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . ."  15 U.S.C. § 1.  To prevail on a section 1 claim, plaintiff must show: "(1) a combination or some form of concerted action between at least two legally distinct economic entities; and (2) such combination or conduct constituted an unreasonable restraint of trade either <u>per se</u> or under the rule of reason."  <u>Tops Mkts., Inc. v. Quality Mkts., Inc.</u>, 142 F.3d 90, 95-96 (2d Cir. 1998).  With respect to the first requirement, the Supreme Court has rejected a formalistic view of whether corporations are "distinct."  <u>See Copperweld Corp. v. Independence Tube Corp.</u>, 467 U.S. 752, 767-76 (1984).  Therefore, an agreement between a subsidiary and its corporate parent does not qualify as an "agreement" capable of violating section 1.  <u>Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.</u>, 996 F.2d 537, 542 (2d Cir. 1993).  As the Supreme Court explained, "[a] parent and its wholly owned subsidiary have a complete unity of interest.  Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one.  They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver.  With or without a formal 'agreement,' the subsidiary acts for the benefit of the parent, its sole shareholder.  If a parent and a wholly owned subsidiary do 'agree' to a course of action, there is no sudden joining of economic resources that had previously served different interests, and there is no justification for [section] 1 scrutiny."  <u>Copperweld</u>, 467 U.S. at 771.

        With respect to the second requirement, while the text of section 1 prohibits "[e]very agreement or conspiracy in "restraint of trade," in application the antitrust laws only proscribe

"agreements that <u>unreasonably</u> restrain trade." <u>NYNEX Corp. v. Discon, Inc.</u>, 525 U.S. 128, 133 (1998).  When a restraint "alleged is among that small class of actions that courts have deemed to have 'such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit,' it will be unreasonable <u>per se</u>." <u>E & L Consulting, Ltd. v. Doman Indus. Ltd.</u>, 472 F.3d 23, 29 (2d Cir. 2006), <u>petition</u> <u>for</u> <u>cert.</u> <u>filed</u>, 75 U.S.L.W. 3638 (U.S. May 18, 2007) (No. 06-1549) (quoting <u>State Oil Co. v. Khan</u>, 522 U.S. 3, 10 (1997)).  <u>Per se</u> violations are "'presumed illegal without further examination' . . . ." <u>Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.</u>, 386 F.3d 485, 506 (2d Cir. 2004) (quoting <u>Broad. Music, Inc. v. Columbia Broad. Sys., Inc.</u>, 441 U.S. 1, 8 (1979)).  "Most antitrust claims, however, are analyzed under a 'rule of reason' analysis which seeks to determine if the alleged restraint is unreasonable because its 'anticompetitive effects outweigh its procompetitive effects.'" <u>E & L Consulting</u>, 472 F.3d at 29 (quoting <u>Atlantic Richfield Co. v. USA Petroleum Co.</u>, 495 U.S. 328, 342 (1990)).

        Under the rule of reason, the plaintiff bears an initial burden to show that that "defendants' challenged behavior 'had an <u>actual</u> adverse effect on competition as a whole in the relevant market.'" <u>Geneva Pharm. Tech.</u>, 386 F.3d at 506-07 (quoting <u>Capital Imaging</u>, 996 F.2d at 543).  "Because the antitrust laws protect competition as a whole, evidence that plaintiffs have been harmed as individual competitors will not suffice." <u>Id.</u> at 507.  It is axiomatic that "'[t]he antitrust laws . . . were enacted for the protection of <u>competition</u>, not <u>competitors</u>.'" <u>Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.</u>, 467 F.3d 283, 290 (2d Cir. 2006) (quoting <u>Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.</u>, 429 U.S. 477, 489 (1977)) (alterations and emphasis added in <u>Paycom Billing</u>) (internal quotation marks omitted).  If the plaintiff meets its burden, then the burden shifts to the defendant to proffer "evidence of the pro-competitive effects of their agreement." <u>Geneva Pharm. Tech.</u>, 386 F.3d at 507.  If pro-competitive effects are demonstrated, the burden returns to the

plaintiff to prove that the legitimate, pro-competitive effects "could have been achieved through less restrictive means."  Id.  It is ultimately for a finder of fact to undertake a careful weighing of both the pro- and anti-competitive effects and to determine whether the restraint promotes or inhibits competition.  Id.

The section 1 claim alleged by Wellnx is that Iovate, acting as the architect of a conspiracy, agreed with several publishers of bodybuilding periodicals to boycott Wellnx in the market for advertising space in bodybuilding publications.  The alleged boycott foreclosed Wellnx's access to 70% of the market for advertising space in such publications.  This conduct allegedly injured competition in the market for that advertising space as well as in the related market for bodybuilding supplements.  Plaintiff alleges that this conspiracy to restrain trade is unreasonable per se and under the rule of reason.

1.      Horizontal or Vertical Conspiracy

Plaintiff alleges that defendants' conspiracy consisted of vertical agreements between a consumer, Iovate, and various sellers, the publishers.  Plaintiff also alleges that the publishers entered into a horizontal agreement.[5]

At the pleading stage, the complaint must contain "enough factual matter (taken as true) to suggest that an agreement was made."  Twombly, 127 S. Ct. at 1965.  Plaintiff must "allege facts that would provide 'plausible grounds to infer an agreement,'" and may not rest on conclusory statements that the defendants "agreed."  Elevator Antitrust Litig., 2007 WL 2471805, at *2 (quoting Twombly, 127 S. Ct. at 1965).  The allegations must raise "a reasonable expectation that discovery will reveal evidence of illegal agreement."  Twombly, 127 S. Ct. at 1965.  "[A]n allegation of

---

[5] "'Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints.'"  E & L Consulting, 472 F.3d at 29 n.4 (quoting Business Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 730 (1988)).

parallel conduct and a bare assertion of agreement will not suffice." Id. at 1966.  Rather, allegations

of parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement,

not merely parallel conduct that could just as well be independent action." Id.

The amended complaint alleges facts from which the existence of vertical agreements

between Iovate and each publishers may be plausibly inferred.  Iovate is alleged to have entered into

an explicit agreement with Canusa containing terms that allowed Iovate to control some of Canusa's

advertising activities and exclude Wellnx's advertisements.  (Am. Compl. ¶¶ 31, 44.)  Iovate is also

alleged to have contacted other publishers to persuade them to refuse Wellnx's advertising business

by either threatening them or providing them with financial incentives.  (Id. ¶ 98.)  It is plausible that

the publishers individually agreed to abide by Iovate's terms.  The publishers subsequently rejected

or cancelled Wellnx's advertisements which was a departure from prior practice, and, absent an

agreement with Iovate, it would have been against their economic interests to decline advertising

revenue from Wellnx.

While the amended complaint adequately pleads the existence of vertical agreements

between Iovate and the individual publishers, it fails to allege facts sufficient to infer a horizontal

agreement between any two publishers.  The principle basis advanced in the amended complaint for

inferring a horizontal agreement is parallel conduct.  "'An allegation of parallel conduct . . . gets the

complaint close to stating a claim, but without some further factual enhancement it stops short of the

line between possibility and plausibility . . . .'" Elevator Antitrust Litig., 2007 WL 2471805, at *3

(quoting Twombly, 127 S. Ct. at 1966) (alteration in Elevator Antitrust Litig.).

The amended complaint recites that certain "plus" factors support the inference of an

agreement among the publishers when viewed together with the parallel conduct.  Specifically,

Wellnx states that (1) the refusal of its advertisements was a departure from prior practice (Am.

Compl. ¶ 96); (2) each publisher was aware that Iovate solicited similar agreements from other publishers (id. ¶ 97); (3) each publisher had a "substantial profit motive" for refusing Wellnx's advertising because Iovate had offered financial incentives or threatened to withdraw its own advertising business (id. ¶ 98); (4) the refusal to deal was uniformly the same by each publisher (id. ¶ 99); and (5) refusing Wellnx's business was against each publisher's self-interest because it caused them to reject valid offers for advertising space (id. ¶ 100).  The amended complaint also speculates that "the publishers of bodybuilding publications that formed vertical agreements with Iovate, including Canusa, were likely made aware of the existence of the group boycott agreements with other [bodybuilding] publications and formed agreements with Iovate believing their horizontal competitors would follow suit."  (Id. ¶ 101.)

These "plus" factors, however, do not constitute plausible grounds to infer an agreement among the publishers.  While this conduct is "consistent with conspiracy, [it is] just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market."  Twombly, 127 S. Ct. at 1964.  The inference that arises from plaintiff's allegations is that each publisher was presented with a choice between losing either Wellnx or Iovate as an advertising customer, or was offered a financial inducement to terminate its relationship with Wellnx.  Each responded to this choice in an identical fashion, but the facts alleged do not imply that this was the result of an agreement among any of them.  To the contrary, the amended complaint states that Iovate supplied each publisher with a "substantial profit motive" to agree to its terms.  The fact that each publisher knew that its horizontal competitors were going to be presented with the same offer or threat, or that others had already capitulated to Iovate, or "believ[ed]" that other competitors would fall in line, does not suffice to "raise[] a suggestion of a preceding agreement . . . ."  Id. at 1966; see also Elevator Antitrust Litig., 2007 WL 2471805, at *3.

For the purposes of the section 1 analysis, the amended complaint adequately pleads the existence of vertical agreements between Iovate and the publishers.  However, no horizontal agreement between any two publishers can be inferred from the allegations.[6]

2.    Per Se Analysis

Plaintiff argues on the basis of Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207 (1959), that defendant's conduct constitutes a per se violation of section 1.  Klor's involved a dispute between a small independent retailer, Klor's, and a larger retail chain, Broadway-Hale, the latter of which acted in concert with several manufacturers and distributors of appliances.  The plaintiff alleged that the manufacturers "conspired among themselves and with Broadway-Hale either not to sell to Klor's or to sell to it only at discriminatory prices and highly unfavorable terms." Id. at 209.  The defendants did not dispute the allegations of concerted action, but moved for summary judgment on the grounds that the market for appliances was open and competitive in spite of the harm to the single retailer Klor's, and so harm to competition could not be proved.

The Supreme Court, reversing the grant of summary judgment for defendants, held that the conduct at issue was unreasonable per se.  The Court stated that "[g]roup boycotts, or concerted refusals to deal with other traders, have long been held to be in the forbidden category" of per se prohibitions, and "have not been saved by allegations that they were reasonable in the specific circumstances, nor by a failure to show that they 'fixed or regulated prices, parceled out or limited

---

[6] I note that the amended complaint does not specify the precise nature of the relationship between Canusa Products Inc. and Musclemag International Corporation (U.S.A.) Inc., except to allege that they are "affiliated."  However, the use of the shorthand "Canusa" to refer to both companies collectively and the fact that the amended complaint does not distinguish between the companies in any of the substantive allegations demonstrates plaintiff's view that the companies' "objectives are common, not disparate," and that "their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one." Copperweld, 467 U.S. at 771.  In other words, Canusa Products Inc. and Musclemag International Corporation (U.S.A.) Inc. are not alleged in the amended complaint to be distinct entities capable of forming a horizontal agreement between them to restrain trade.

production, or brought about deterioration in quality.'"  <u>Id.</u> at 212 (quoting <u>Fashion Originators'</u>
<u>Guild of Am. v. FTC</u>, 312 U.S. 457, 466 (1941)).

      The Supreme Court has significantly limited the reach of the <u>per</u> <u>se</u> prohibition
announced in <u>Klor's</u>.  In <u>NYNEX Corp. v. Discon, Inc.</u>, 525 U.S. 128 (1998), a seller of telephone
systems removal services agreed with a buyer of such services to an exclusive dealing arrangement
in order to perpetrate a regulatory fraud and to harm the seller's competitor.  The harmed competitor
sued, alleging that the boycott of its services was <u>per</u> <u>se</u> illegal under <u>Klor's</u>.  The Supreme Court
disagreed, and noted that <u>Klor's</u> "involve[ed] not simply a 'vertical' agreement between supplier and
customer, but . . . also . . . a 'horizontal' agreement among competitors."  <u>NYNEX</u>, 525 U.S. at 136.
The Court limited the <u>per</u> <u>se</u> rule of <u>Klor's</u> to cases involving horizontal agreements, and affirmed
"that a 'vertical restraint is not illegal <u>per</u> <u>se</u> unless it includes some agreement on price or price
levels.'"  <u>Id.</u> (quoting <u>Business Elecs.</u>, 485 U.S. at 735-36).[7]

      In <u>Pepsico, Inc. v. Coca-Cola Co.</u>, 315 F.3d 101 (2d Cir. 2002) (per curiam), the
Second Circuit considered whether an alleged "hub and spokes" conspiracy, similar to that alleged in
this case, was properly classified as a horizontal group boycott, and thus illegal <u>per</u> <u>se</u> under <u>Klor's</u>,
or merely a series of vertical restraints to be analyzed under the rule of reason.  In that case, the
defendant manufacturer entered into vertical agreements with distributors to boycott the
manufacturer's competitor.  The court, affirming the grant of summary judgment, held that absent
evidence of an agreement between the distributors, the conspiracy was vertical and applied the rule
of reason.  <u>Id.</u> at 110.  Notwithstanding the horizontal effects of a series of vertical agreements
between one firm and several other firms at the same level of distribution, the court concluded that

---

[7] I note that recently the Supreme Court overruled its longstanding precedent, established in <u>Dr. Miles Med. Co. v.</u>
<u>John D. Park & Sons Co.</u>, 220 U.S. 373 (1911), that vertical minimum resale price agreements are illegal <u>per</u> <u>se</u>.
<u>See</u> <u>Leegin Creative Leather Prods., Inc. v. PSKS, Inc.</u>, __ U.S. __, 127 S. Ct. 2705 (2007).

"NYNEX . . . squarely held that a horizontal agreement is a prerequisite in a group boycott case." Id. at 110.

Since plaintiff's amended complaint fails to adequately plead the existence of a horizontal agreement, plaintiff has failed to state a claim for a per se violation of section 1 of the Sherman Act under a group boycott theory.

### 3.   Rule of Reason Analysis

Under the rule of reason, the plaintiff must show that "defendants' challenged behavior 'had an actual adverse effect on competition as a whole in the relevant market.'"  Geneva Pharm. Tech., 386 F.3d at 506-07 (quoting Capital Imaging, 996 F.2d at 543).  A complaint alleging a section 1 violation under the rule of reason must contain facts sufficient to render the claim of harm to competition plausible.  See E & L Consulting, 472 F.3d at 28-31; Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc., 129 F.3d 240, 245 (2d Cir. 1997); see generally Iqbal, 490 F.3d at 157-58.  Harm to competition can be inferred from facts such as "reduced output, increased prices and decreased quality" in the relevant market.  Virgin Atl. Airways Ltd. v. British Airways PLC, 257 F.3d 256, 264 (2d Cir. 2001).  "Without any allegation as to how market-wide competition will be affected, the complaint fails to allege a claim on which relief can be granted."  Elecs. Commc'ns, 129 F.3d at 245.

Plaintiff alleges that the agreements between Iovate and the publishers have harmed competition in two markets.  The first market is the market for advertising space in bodybuilding publications.  The second market is the related consumer market for bodybuilding supplements.

i.        Competition in the Market for Advertising Space

Plaintiff alleges that the "refusal to deal described [in the amended complaint] had the effect of unreasonably restraining trade in the sale of advertising space in bodybuilding publications . . . ."  (Am. Compl. ¶ 127.)  This conclusory statement is not supported by allegations of fact.

There is no allegation, for instance, that the agreements between Iovate and the publishers adversely effected price, output or quality of services in the overall market for advertising space.  Wellnx is but one consumer in a competitive market in which, according to the amended complaint, more than 20 other firms compete as consumers.  See Tops Mkts., 142 F.3d at 96 ("[T]he fact that [plaintiff] may have been prevented from competing in the [relevant] market does not alone prove an adverse effect on competition as a whole.").  The exclusion of Wellnx is also merely partial; Wellnx still has access to 30% of the market.

In singling out only the plaintiff among many competing firms, the alleged conspiracy has far less impact on the market than would an exclusive advertising agreement between Iovate and the publishers.  The Second Circuit has held that exclusive distribution agreements are presumptively legal because they often have pro-competitive effects, such as "assuring steady supply, affording protection against price fluctuations, reducing selling expenses, and promoting stable, long-term business relationships."  Geneva Pharm. Tech., 386 F.3d at 508; see also E & L Consulting, 472 F.3d at 30.  An exclusive distribution agreement only constitutes "an unreasonable restraint of trade . . . when the agreement freezes out a significant fraction of buyers or sellers from the market."  Geneva Pharm. Tech., 386 F.3d at 508.  Iovate's agreements only freeze out one competitor from 70% of the market.  All other competitors compete unobstructed, and even Wellnx remains free to compete in 30% of the market.

The more detailed agreement between Iovate and Canusa for special advertising considerations also fails to raise a plausible inference of market-wide harm to competition. The Agreement does not preclude competitors from purchasing advertising space from Canusa and does not fix prices or limit output. Iovate's special access to and influence over the approval of competitors' advertisements with Canusa may diminish the quality of Canusa's advertising space from the standpoint of Iovate's competitors, but this does not plausibly harm competition market-wide. The remaining 60% of the advertising market is free to compete with Canusa by offering better services to advertising consumers.

A plaintiff alleging harm to competition may, in lieu of showing actual harm, allege that defendants possess "market power" in the relevant market. Tops Mkts., 142 F.3d at 97. Market power is defined as "the ability to raise price significantly above the competitive level without losing all of one's business." CDC Techs., Inc. v. IDEXX Labs., Inc., 186 F.3d 74, 81 (2d Cir. 1999) (internal quotation marks omitted). Market share may be used as a proxy to demonstrate market power. K.M.B. Warehouse Distributors, Inc. v. Walker Mfg. Co., 61 F.3d 123, 129 (2d Cir. 1995). However, market share alone is insufficient to demonstrate market power; plaintiff must show market share "plus some other ground for believing that the challenged behavior could harm competition in the market, such as the inherent anticompetitive nature of the defendant's behavior or the structure of the interbrand market." Tops Mkts., 142 F.3d at 97.

The amended complaint alleges that both Canusa and Iovate possess "market power" in the markets for advertising space and bodybuilding supplements, respectively. No factual allegations support these conclusory statements. Plaintiff does not claim that Iovate or Canusa are monopolists or capable of unilaterally raising prices to supracompetitive levels without losing their business. In addition, neither Canusa's nor Iovate's market share, viewed in combination with other

facts alleged about the relevant markets, raises a plausible inference of market power by either

defendant.  Plaintiff has failed to adequately allege plausible grounds for inferring actual harm to

competition in the market for advertising space.  The amended complaint thus fails to state a claim

for a section 1 violation by defendants in that market.  See Elecs. Commc'ns, 129 F.3d at 245.

### ii.    Competition in the Bodybuilding Supplement Market

The amended complaint also alleges harm to competition in the market for

bodybuilding supplements.  Plaintiff states that the agreements between Iovate and the publishers

create a significant entry barrier in the bodybuilding supplement market, and that prices have

achieved supracompetitive levels.  The bodybuilding supplement market is allegedly affected by the

conspiracy because consumer demand for supplements is driven by marketing through advertising in

bodybuilding publications.

The allegations do not plausibly support the claim that a significant entry barrier in

the market for bodybuilding supplements has been created by the alleged conspiracy.  Competition

in the supplement market is "highly competitive."  Only plaintiff is affected by these agreements,

and it has already entered the market.  A series of agreements which hinder only plaintiff's ability to

compete does not plausibly erect an entry barrier for others into the overall market.  See Tops Mkts.,

142 F.3d at 96.

Similarly, plaintiff's allegation that prices for bodybuilding supplements are being

maintained at supracompetitive levels is not plausibly supported by the factual allegations.  As

noted, the amended complaint describes the market for bodybuilding supplements as "highly

competitive" and states that there is a high cross-elasticity of demand within the market for such

supplements.  A highly competitive market with reasonably interchangeable products is not one

where supracompetitive pricing can be easily maintained.  Plaintiff's allegations are particularly

implausible since the alleged conspiracy in the advertising market does not prevent plaintiff's supplements from being sold in the bodybuilding supplement market.

Consumers of bodybuilding supplements do not purchase products directly from magazines.  Advertising space in bodybuilding publications is therefore not reasonably considered a "bottleneck" in the chain of distribution.  Compare Geneva Pharm. Tech., 386 F.3d at 509.  The Second Circuit has noted that "'[i]f competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether [exclusive dealing arrangements with distributors] foreclose from competition any part of the relevant market.'" CDC Techs., 186 F.3d at 80 (quoting Omega Envtl., Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1163 (9th Cir. 1997) (alterations in CDC Techs.)); see also Pepsico, 315 F.3d at 111.  In this case, plaintiff's products are available to consumers directly by plaintiff, by distributors and by retailers.  Plaintiff has alternative channels of advertising to the market through bodybuilding publications that accept plaintiff's advertisements.  Therefore, plaintiff's claim of outlet foreclosure is implausible.[8]

For similar reasons, the unique Agreement between Iovate and Canusa fails to plausibly support the allegation that competition in the market for bodybuilding supplements is harmed.  The Agreement does not prevent any products from being offered to consumers of bodybuilding supplements.  To the contrary, plaintiff alleges that Iovate uses its authority under the Agreement to beat its competitors to the market with new products.  This conduct may harm distinct competitors, but it promotes interbrand competition and is not harmful to consumer welfare.  For these reasons, and because plaintiff has not adequately alleged that defendants have

---

[8] While the amended complaint bases the section 1 claim on the conduct of Iovate and the publishers, the additional consideration of Iovate's interference with the distributors would not alter my conclusions regarding the sufficiency of the pleading.  The alleged interference with five U.S. distributors and one British distributor is not claimed to significantly impede or obstruct Wellnx's access to consumers of bodybuilding supplements through other distribution channels.  The amended complaint contains no facts relating to the named distributors' shares of the consumer market.  There are no allegations from which significant foreclosure could be reasonably inferred.

"market power" in any relevant market, the amended complaint fails to sufficiently allege how competition is harmed in the market for bodybuilding supplements.  See Elecs. Commc'ns, 129 F.3d at 245.

Plaintiff's allegations also do not support an inference that advertising in the foreclosed segment of the market is an "essential facility" for competing generally in the bodybuilding supplement market.  To prevail on a claim alleging an essential facility, the plaintiff must "demonstrate that 'duplication of the facility would be economically infeasible' and that 'denial of its use inflicts a severe handicap on potential [or current] market entrants.'"  Twin Labs., Inc. v. Weider Health & Fitness, 900 F.2d 566, 568 (2d Cir. 1990) (quoting Hecht v. Pro-Football, Inc., 570 F.2d 982, 992 (D.C. Cir. 1977)) (alteration and emphasis added in Twin Labs.).  Plaintiff must establish: "'(1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility.'"  Id. at 569 (quoting MCI Commc'ns Corp. v. Am. Tel. & Tel. Co., 708 F.2d 1081, 1132-33 (7th Cir. 1983)).

In this case, no defendant is alleged to be a monopolist.  Plaintiff is able to "practically or reasonably duplicate" the facility by advertising in bodybuilding publications that accept plaintiff's business.  As the Second Circuit emphasized, to find an essential facility, "an alternative to the facility [must] not [be] feasible."  Id. at 570.  Based on the facts alleged in the amended complaint, that is not the case.

Although the amended complaint does not invoke a monopolization claim under section 2 of the Sherman Act, I note that the facts alleged also fail to state a claim for leveraging under section 2.  Monopoly leveraging requires the plaintiff to show that the defendant "(1) possessed monopoly power in one market; (2) used that power to gain a competitive advantage over

32

[plaintiff] in another distinct market; and (3) caused injury by such anticompetitive conduct." Virgin Atl., 257 F.3d at 272.  The Supreme Court has imposed an additional requirement that there be a "dangerous probability of success in monopolizing a second market."  Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 415 n.4 (2004) (internal quotation marks omitted).  Plaintiff has not alleged that any defendant has monopoly power in any market; therefore, the amended complaint does not state a claim for leveraging.

In sum, the amended complaint fails to state a claim under the Sherman Act.  The alleged vertical restraints do not raise a plausible inference of harm to competition in the markets identified in the amended complaint.

> D.      Jurisdiction Over the Remaining Claims

The amended complaint invokes the diversity statute, 28 U.S.C. § 1332, as a basis for subject matter jurisdiction.  Plaintiff is alleged to be an Ontario corporation with its principal place of business in Mississauga, Ontario, Canada.  All defendants, with the exception of Musclemag International Corporation (U.S.A.) Inc. and Iovate Health Sciences U.S.A. Inc., are also residents and citizens of Canada, and the corporate defendants are also Ontario corporations with their principal places of business in Mississauga, Ontario.  The Second Circuit has stated that under the diversity statute, "diversity is lacking . . . where on one side there are citizens and aliens and on the opposite side there are only aliens."  Universal Licensing Corp. v. Paola del Lungo S.p.A., 293 F.3d 579, 581 (2d Cir. 2002).  As this case involves an alien plaintiff and several alien defendants in addition to the U.S. defendants, diversity jurisdiction is lacking.

Under the supplemental jurisdiction statute, the district court may decline to exercise jurisdiction over state law claims when the "court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  In Valencia ex rel. Franco v. Lee, 316 F.3d 299 (2d

Cir.2003), the district court had dismissed all federal claims, including one asserted under section 1983, and continued to exercise supplemental jurisdiction over state law claims, invoking 28 U.S.C. § 1367. The Court of Appeals noted that "[i]n providing that a district court 'may' decline to exercise such jurisdiction, this subsection is permissive rather than mandatory." Id. at 305. However, "[t]he proper scope of the district court's discretion . . . is not boundless. Id. "'[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims.'" Id. (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)).

In this case, dismissal over all federal claims has been granted on the motion to dismiss 10 months after the amended complaint was filed. This is a "usual case" in which the balance of factors counsels in favor of declining supplemental jurisdiction. The state law claims are therefore dismissed without prejudice.

III.   CONCLUSION

For the foregoing reasons, Claims 1 and 2 in the amended complaint are dismissed for failure to state a claim. The state law claims, Claims 3 through 9, are dismissed without prejudice. The Clerk shall enter final judgment for the defendants.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       September 25, 2007